No. 24-5602

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ROGER WAYNE PARKER,

*Plaintiff-Appellant*

v.

COUNTY OF RIVERSIDE, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 21-cv-01280-JGB-DTB, Hon. Judge Jesus G. Bernal

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
SOUTHERN CALIFORNIA, AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, NATIONAL POLICE
ACCOUNTABILITY PROJECT, AND PUBLIC JUSTICE AS
AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT**

Eliana Machefsky
National Police Accountability Project
P.O. Box 2981
Berkeley, CA 94702
(314) 440-3505
eliana.npap@nlg.org

Hannah M. Kieschnick
Public Justice
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
hkieschnick@publicjustice.net

Summer Lacey
Jacob Reisberg
ACLU Foundation of Southern California
1313 West Eighth St.
Los Angeles, CA 90017
(213) 977-5224
slacey@aclusocal.org
jreisberg@aclusocal.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae certify that they are all non-profit organizations. They have no parent corporations, and no publicly owned corporation owns 10% or more of their stock.

Date: February 6, 2025

/s/ Hannah M. Kieschnick
Hannah M. Kieschnick

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................... iii

INTERESTS OF AMICI CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ................................................................................. 5

    I.    The Riverside County District Attorney's Office can and should be liable for its practice of tolerating, if not encouraging, the suppression of evidence. ....................................................... 5

        A.    Mr. Parker challenged the District Attorney's Office's longstanding practice and custom of suppressing exculpatory evidence ..................................................... 5

        B.    California district attorneys' offices act for the county, not the state, when setting policies that may impact prosecutions ....... 10

    II.    *Monell* liability is necessary to deter and prevent prosecutorial misconduct and to remedy constitutional violations ........................... 18

        A.    Civil suit under Section 1983 is the primary mechanism for victims of government abuse to vindicate their rights ........ 19

        B.    Individual prosecutors rarely face legal or professional consequences for their misconduct ........................................... 20

        C.    Municipal liability is an indispensable check on systemic prosecutorial misconduct and a necessary remedy for plaintiffs like Mr. Parker ........................................... 23

CONCLUSION .................................................................................. 28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ................................................................24

*Baca v. Adams*,
777 F.3d 1034 (9th Cir. 2015) ............................................8

*Baca v. Adams*,
No. ED CV 08-683-MMM PJW, 2013 WL 3071248
(C.D. Cal. June 18, 2013) .................................................7, 9

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019) ......................................... 16, 17

*Carter v. City of Philadelphia*,
181 F.3d 339 (3d Cir. 1999) ..............................................17

*Connick v. Thompson*,
563 U.S. 51 (2011) ..................................................... 11, 25

*Felder v. Casey*,
487 U.S. 131 (1988) ...........................................................19

*Goldstein v. City of Long Beach*,
715 F.3d 750 (9th Cir. 2013) .................................... *passim*

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ................................................... 20, 21

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*,
440 U.S. 391 (1979) ...........................................................26

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ...........................................................20

*McMillian v. Monroe County*,
520 U.S. 781 (1997) ................................................... 11, 27

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) ................................................. *passim*

*Monroe v. Pape,*
    365 U.S. 167 (1961) ...........................................................................20

*Myers v. County of Orange,*
    157 F.3d 66 (2d Cir. 1998)................................................................16

*Owen v. Independence,*
    445 U.S. 622 (1980) ................................................................ *passim*

*Pitts v. County of Kern,*
    17 Cal.4th 340 (1998)................................................................ 13, 14

*United States v. Olsen,*
    737 F.3d 625 (9th Cir. 2013)..................................................... 21, 25

*Walker v. City of New York,*
    974 F.2d 293 (2d Cir. 1992)..............................................................15

*Weiner v. San Diego County,*
    210 F.3d 1025 (9th Cir. 2000)............................................................6

**Statutes and Legislative Materials**

42 U.S.C. § 1983.................................................................... *passim*

Cong. Globe, 42 Cong., 1st Sess. (1871).............................. 20, 24

**Rules**

FRAP 26.1 ...................................................................................... i

**Other Authorities**

California Commission on the Fair Administration of Justice, *Final Report*
    (2008), https://tinyurl.com/n62krs62 .................................................13

Fair Punishment Project, *Too Broken to Fix: Part 1: An In-Depth Look at
    America's Outlier Death Penalty Counties* (Aug. 2016),
    https://tinyurl.com/3bfn22kc ..........................................................6, 7

Samuel R. Gross, et al., *Government Misconduct and Convicting the
    Innocent: The Role of Prosecutors, Police and Other Law
    Enforcement,* The National Registry of Exonerations (Sep. 1, 2020),
    https://tinyurl.com/58z4wzsn ...........................................................22

Innocence Project, *Prosecutorial Oversight: A National Dialogue in the Wake of* Connick v. Thompson (Mar. 2016), https://tinyurl.com/448abpvy ................................................................21

Margaret Z. Johns, *Reconsidering Absolute Prosecutorial Immunity*, 2005 B.Y.U. L. Rᴇᴠ. 53 (2005) ....................................................................21

David Keenan et al., *The Myth of Prosecutorial Accountability After* Connick v. Thompson*: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct*, 121 Yale L.J. Online 203 (2001) ..............................................................21

Alex Kozinski, *Preface: Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii (2015) ...................................................................................23

Mark C. Niles, *Deliberate Indifference: Respondeat Superior Liability for Municipalities in Civil Rights Cases as an Alternative to Qualified Immunity Reform*, 25 N.Y.U. J. Legis. & Pub. Pol'y 387 (2023) .......24

Oral Argument, *Baca v. Adams*, 777 F.3d 1034 (9th Cir. 2015) (No. 13-56132), https://tinyurl.com/y3hbh48n................................................3, 8

Kathleen M. Ridolfi & Maurice Possley, *Preventable Error: A Report on Prosecutorial Misconduct in California 1997-2009* (Oct. 2010), https://tinyurl.com/ytznyw4h ........................................................7, 22

## INTERESTS OF AMICI CURIAE[1]

Amici curiae the **American Civil Liberties Union Foundation of Southern California** and the **American Civil Liberties Union Foundation of Northern California** (together, the ACLU California Affiliates) are nonprofit, nonpartisan organizations dedicated to defending the principles embodied in the U.S. Constitution and our nation's civil rights laws. The ACLU California Affiliates frequently appear before the U.S. Supreme Court, this Court, and other federal and state courts in cases defending the rights of criminal defendants and those in pretrial custody. The ACLU California Affiliates are particularly concerned with safeguarding the protections of the Due Process Clause; ensuring prosecutors are held accountable for their misconduct; and protecting the physical liberty of people in the criminal legal system. ACLU attorneys and advocates bring litigation to protect these constitutional principles and promote legislation and local policy in accordance with these values.

The **National Police Accountability Project** (NPAP) was founded in 1999 by members of the National Lawyers Guild to address misconduct by law

---

[1] No party's counsel authored this brief in whole or in part. In addition, no party or party's counsel and no person—other than amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. Counsel of record for both parties do not object to the filing of this brief.

enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including members representing clients who have been grievously harmed by prosecutorial misconduct.

Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for nonprofit organizations and community groups working on law enforcement accountability issues. NPAP also appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

**Public Justice** is a nonprofit legal advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. Public Justice has long maintained an Access to Justice Project, which seeks to ensure that civil courts are an effective tool that people with less power can use to win just outcomes and hold to account those with more power. Towards that end, Public Justice has an interest in addressing overbroad assertions of immunity that prevent victims of government abuse from having their day in court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Systemic prosecutorial misconduct left Roger Wayne Parker to languish in jail for nearly four years for a crime prosecutors in the Riverside County District Attorney's Office knew he did not commit. During that period, line prosecutors tried and failed to convince their supervisors that the charges against Mr. Parker should be dismissed in light of evidence exculpating Mr. Parker. Instead, in keeping with the Office's history of pursuing convictions by unscrupulous means—as documented by multiple studies and criticized by members of this Court in *Baca v. Adams*[2]—the supervisors told these attorneys to ignore their constitutional duties to disclose evidence and persist in prosecuting Mr. Parker. When the line attorneys resisted, they were reassigned.

Mr. Parker seeks accountability for his wrongful incarceration at the hands of the Riverside County District Attorney's Office. His case is a core example of why municipal liability under 42 U.S.C. § 1983 exists: to guard constitutional rights against systemic failures in government administration, particularly where injured plaintiffs like Mr. Parker might have no recourse against the individuals who contributed to their harm. Yet the District Court concluded that the County of

---

[2] *See* Oral Argument at 18:20, 27:27, *Baca v. Adams*, 777 F.3d 1034 (9th Cir. 2015) (No. 13-56132), https://tinyurl.com/y3hbh48n.

Riverside cannot be held liable under Section 1983 for violating Mr. Parker's rights. The court misunderstood Mr. Parker to be challenging the exercise of prosecutorial strategy in his case, which would be a state function falling within the scope of Eleventh Amendment immunity. That was wrong as a matter of fact because Mr. Parker challenged an office-wide policy of suppressing exculpatory evidence. And it was wrong as a matter of law because policies *related to* prosecutorial strategy are not the same for Section 1983 liability purposes as the exercise of prosecutorial strategy in a particular case. *See Goldstein v. City of Long Beach*, 715 F.3d 750, 752 (9th Cir. 2013).

If left to stand, the District Court's decision would amount to a categorical rule that any California district attorney's office-wide policy or practice that applies to all prosecutions is necessarily prosecutorial in nature and therefore immune from legal recourse. That would render Section 1983 meaningless for plaintiffs harmed by systemic prosecutorial misconduct and would be inconsistent with the purposes of both Section 1983 and municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). This Court should reverse.

## ARGUMENT

### I. THE RIVERSIDE COUNTY DISTRICT ATTORNEY'S OFFICE CAN AND SHOULD BE LIABLE FOR ITS PRACTICE OF TOLERATING, IF NOT ENCOURAGING, THE SUPPRESSION OF EVIDENCE.

Mr. Parker alleges here that his wrongful pre-trial detention was the result of the Riverside District Attorney's Office's longstanding de facto policy of suppressing exculpatory evidence in the pursuit of convictions. As explained in Section II, *infra*, municipal liability under Section 1983 exists to remediate exactly this type of systemic failing by a local government. And yet, the District Court below concluded otherwise, granting judgment on Mr. Parker's claim against the County of Riverside because, it thought, he was challenging a specific action taken in his case—and thus a state prosecutorial function—rather than a county policy. That was error for two reasons. First, Mr. Parker did challenge a local policy, practice, or custom. Second, the policy, practice, or custom Mr. Parker alleges caused his four-year wrongful detention—the pervasive suppression of exculpatory evidence—is an office-wide, and thus local, policy subject to Section 1983 liability.

### A. Mr. Parker challenged the District Attorney's Office's longstanding practice and custom of suppressing exculpatory evidence.

The District Court fundamentally misconstrued the gravamen of Mr. Parker's theory of municipal liability, focusing on the role that Defendant District Attorney Zellerbach played in Mr. Parker's prosecution. *See* 1-ER-11 (interpreting Mr. Parker as alleging "only that Defendant Zellerbach ratified his employees' decisions to

5

withhold exculpatory evidence and continue Plaintiff's prosecution"). But the core of Mr. Parker's claim is that the Riverside County District Attorney's Office has a pervasive practice and custom of forcing line prosecutors to disregard their constitutional and statutory duties to disclose exculpatory evidence in the pursuit of convictions, and that this custom and practice caused his wrongful detention. *See* 2-ER-34-35, ¶¶ 23-28; 2-ER-44, ¶¶ 61-62. Mr. Parker's allegations render this Court's holding in *Weiner v. San Diego County*, 210 F.3d 1025, 1030-31 (9th Cir. 2000), that a California district attorney acts as a state official when prosecuting a specific case, inapposite here. *Contra* 1 ER 10.

As Mr. Parker alleged, his experience is just one example of the Riverside County District Attorney's Office's long-standing practice of encouraging prosecutorial misconduct—including the suppression of exculpatory evidence—to secure convictions. Mr. Parker cited, for example, a 2017 study by the Harvard Law School's Fair Punishment Project, which found thirty-two reported instances of prosecutorial misconduct in Riverside and four reversals on those grounds between 2010 and 2015. 2-ER-35, ¶ 28 (citation omitted). Similarly, a 2010 study identified five cases between 1997 and 2009 in which a court concluded that a Riverside prosecutor engaged in misconduct so prejudicial as to impact the fairness of the proceeding, and another forty-three cases in which a court agreed there was prosecutorial misconduct but, under the rigorous applicable standards, that it was

ultimately harmless.[3] Many of those cases involved the failure to disclose evidence. In 2008, for example, the superior court in Riverside dismissed a narcotics prosecution after ruling that a prosecutor intentionally withheld evidence from the defense.[4] The next year, a state appellate court affirmed the declaration of a mistrial after a Riverside prosecutor "ambushed" the defendant with "previously undisclosed evidence."[5] Other reports have similarly detailed instances of prosecutorial misconduct in Riverside as well as the Riverside County District Attorney's failures to address those problems.[6]

With good reason, then, judges of this Court and on lower courts in this Circuit have repeatedly questioned the Riverside County District Attorney's Office's practices and its commitment to complying with constitutional and statutory law. Most prominently, in *Baca v. Adams*, the magistrate judge condemned the systemic issues that led to Mr. Baca's wrongful conviction: "What is obvious from reviewing

---

[3] *See* Kathleen M. Ridolfi & Maurice Possley, *Preventable Error: A Report on Prosecutorial Misconduct in California 1997-2009* at 100, 108-09 (Oct. 2010), https://tinyurl.com/ytznyw4h.

[4] *Id.* at 56 (citation omitted).

[5] *See People v. Medina*, 2009 WL 498686, at *4 (Cal. Ct. App. Feb. 27, 2009) (cited by Ridolfi & Possley, *Preventable Error, supra* 7 n.3, at 100).

[6] *See* Fair Punishment Project, *Too Broken to Fix: Part 1: An In-Depth Look at America's Outlier Death Penalty Counties* at 32 (Aug. 2016), https://tinyurl.com/3bfn22kc (describing the Riverside County District Attorney's "response to the misconduct" in *Baca* as "telling: he refused to admit that either prosecutor intentionally committed misconduct and promised to retry the defendant"); *id.* at 36 (listing exonerations in non-capital cases prosecuted by the Riverside County District Attorney's Office).

the record in this case is that the Riverside County District Attorney's Office turned a blind eye to fundamental principles of justice to obtain a conviction in this case." No. ED CV 08-683-MMM-PJW, 2013 WL 3071248, at *16 (C.D. Cal. June 18, 2013) (quoting report & recommendation), *rev'd on other grounds*, 777 F.3d 1034 (9th Cir. 2015) (granting habeas relief). After chronicling the "numerous acts of misconduct" identified by the reviewing state court, including withholding exculpatory evidence, *id.* at *17, the magistrate judge continued, "One might think that such a criticism of a prosecutor's performance . . . would bring condemnation, or at least counseling. Not in the Riverside County District Attorney's Office. It did not even bring a yawn," *id.* The magistrate judge further emphasized that the glaring misconduct reflected a failure "in [the Office's] mission to pursue justice" *Id.* at *20. Even so, the magistrate judge felt compelled to deny habeas relief to Mr. Baca—a decision this Court reversed. As then-Chief Judge Kozinski predicted during oral argument for Mr. Baca's appeal, if left unchecked, the Office would continue its practice of hiding impeachment and exculpatory evidence.[7]

Mr. Parker's experience confirms these systemic failings did in fact continue. He was detained for almost four years after confessing to a murder he did not

---

[7] Oral Argument at 18:20, 27:27, *Baca v. Adams*, 777 F.3d 1034 (9th Cir. 2015) No. 13-56132, https://tinyurl.com/y3hbh48n (quoted at 2-ER-34, ¶ 26).

commit. 2-ER-27, ¶ 1. Mr. Parker, who is developmentally delayed, later said he confessed after fifteen hours of interrogation because the detectives had assured him that self-defense was legal but continuing to deny any wrongdoing would land him in jail. 2-ER-28, ¶ 5; *see also* 2-ER-51.

The line prosecutors assigned to Mr. Parker's case quickly became convinced of his innocence and tried, in vain, to have the charges against him dismissed. 2-ER-29-31, ¶¶ 6-19. These prosecutors expressed "serious concerns" at staff meetings, shared multiple memos with their supervisors recommending against pursuing the charges, and repeatedly emphasized the obvious discrepancies between the evidence and Mr. Parker's guilt, including that the fingerprints on the murder weapon did not match Mr. Parker's fingerprints and the DNA evidence "eliminated" Mr. Parker. 2 ER 49-51; *see also* 2-ER-30, ¶¶ 10-12.

These prosecutors were reassigned and their misgivings pushed aside by supervising attorneys who insisted on pressing on, notwithstanding the obvious evidence that Mr. Parker was innocent. 2-ER-29, ¶¶ 8-9; 2-ER-32, ¶ 17. Indeed, three-and-a-half years into Mr. Parker's detention, the second attorney on his case obtained recorded jail calls in which Mr. Parker's former roommate confessed to the murder. 2-ER-31, ¶ 15. When he brought this exculpatory evidence to his supervisor, he was told not to turn over the discovery and was removed from the case. 2-ER-32, ¶¶ 16-17; 2-ER-194-95. That supervisor sat on the confession *for another six months*

9

before finally moving to dismiss Mr. Parker's case. 2-ER-32, ¶ 18. During that time, the County received a claim for damages from the second attorney who had since left the District Attorney's Office for harassment he experienced in part because of "his refusal to prosecute an innocent defendant and his repeated recommendation that the defendant be released from custody and his case dismissed." 2-ER-32, ¶ 19. Referencing Mr. Parker, the damages claim noted that the "defendant remains in custody although the evidence all supports his factual innocence." *Id.*

In short, the District Court clearly erred in overlooking Mr. Parker's well-pled allegations of the County of Riverside's pattern and custom of suppressing exculpatory evidence in the pursuit of convictions at all costs.

### B. California district attorneys' offices act for the county, not the state, when setting policies that may impact prosecutions.

To the extent the District Court did consider Mr. Parker's policy, practice, or custom theory, it conflated prosecutorial actions in a specific case with office-wide policies and practices that impact prosecutorial actions, concluding that both are undertaken on behalf of the state and thus not subject to liability under Section 1983. But as this Court confirmed in *Goldstein*, the two are not the same. This Court should take the opportunity to reaffirm, consistent with *Goldstein* and the approaches of other courts of appeal, that setting office-wide policies and practices—including those touching on prosecutorial functions—is an administrative function on behalf of the locality. Otherwise, a district attorney's office could, with impunity, adopt a

10

policy directing its line prosecutors not to disclose any exculpatory material *ever* in *any* case—a result obviously contrary to both the purpose of Section 1983, *see* Section II, *infra*, and controlling law. Applying that controlling law here, Defendant Zellerbach represented the County of Riverside when perpetuating the District Attorney's Office's documented practice of prioritizing convictions over complying with the constitutional duty to disclose exculpatory evidence.

Municipal liability is available under Section 1983 when an individual plaintiff, like Mr. Parker, can show his harm was caused by an unlawful policy of the government itself. *See Monell,* 436 U.S. at 690-91. A policy encompasses not just formal "decisions of a government's lawmakers" but also "practices so persistent and widespread as to practically have the force of law" and agency failures to train, supervise, or discipline employees. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However the policy is set, the challenged conduct must be a function of a local government entity because states and state officers are immune from liability under Section 1983 by virtue of the Eleventh Amendment. *See McMillian v. Monroe County*, 520 U.S. 781, 785 (1997). The inquiry into whether an official acts on behalf of the locality or the state depends on state law and is a "function-by-function" determination because certain officials, including district attorneys, occupy a hybrid status depending on the various functions of their office. *Goldstein*, 715 F.3d at 753.

The District Court's error flowed from an unduly narrow reading of this Court's holding in *Goldstein*. In that case, this Court carefully parsed California constitutional and statutory law to conclude that California district attorneys "act[] on behalf of the state when conducting prosecutions," *id.* at 759, but "act as local policymakers when adopting and implementing internal policies and procedures related to the use of jailhouse informants," *id.* at 755. The Court drew this line by explaining that district attorneys act on behalf of the municipalities they were elected to represent, and which employ them, when the challenged conduct involves office management or "administrative oversight of systems used to help prosecutors comply with their constitutional duties." *Id.* at 762 (citations omitted). While the Court focused on one system—an index of jailhouse informants—*Goldstein* is not limited to list-making. Instead, it stands for the proposition that the creation and maintenance of the range of policies, practices, trainings, and other tools designed to facilitate (or impede) prosecutors' compliance with their constitutional duty to disclose evidence is an administrative, and thus local, function.

As part of its analysis, the *Goldstein* Court looked to the "practical treatment of the policies" at issue, which "support[ed] the conclusion that" the creation of office-wide procedures and training relating to the disclosure of impeachment evidence "is a local, not statewide, determination." *Id.* at 758. In particular, the Court looked to a 2008 report by the California Commission on the Fair Administration of

12

Justice, which recommended that every district attorney's office "adopt a written internal policy, wherever feasible, to govern the use of in-custody informants." *Id.* at 759 (citations omitted). The Court found it "instructive" that this recommendation was directed at local district attorney's offices rather than the legislature or Attorney General. *Id.* Importantly, that same 2008 report similarly recommended that district attorney's offices, *not* the legislature or Attorney General, "formulate and disseminate a written Office Policy to govern *Brady* compliance."[8] *Goldstein*'s reasoning thus applies with equal force to the type of office-wide policies and trainings that Mr. Parker challenges here—those relating to the disclosure of exculpatory evidence.

In *Goldstein*, just as in this case, the policy in question had the potential to affect the course of specific prosecutions because it determined whether line prosecutors had access to information about jail informants that may need to be disclosed as impeachment evidence. Even so, the Court expressly *declined* to adopt the reasoning of the California Supreme Court in *Pitts v. County of Kern*, 17 Cal.4th 340, 366 (1998), which held that a district attorney acted for the state, not the county, "when training and developing policies for employees in these activities." *See*

---

[8] Cal. Comm'n on the Fair Admin. of Justice, *Final Report* at 16 (2008), https://tinyurl.com/n62krs62.

*Goldstein*, 715 F.3d at 761; *see also id.* at 755-58 (detailing fourteen reasons why district attorneys are almost always, if not always, acting on behalf of the county and not the state, including that "counties are required to defend and indemnify the district attorney for an action for damages"—a "crucial factor [that] weighs heavily" in favor of finding a local, not state, function) (citation omitted).

The *Goldstein* concurrence addressed *Pitts* in greater detail, finding "unpersuasive "and "imprecise" its categorical rule that all policies and trainings related to prosecutorial functions are necessarily state functions. *Id.* at 763 (Reinhardt, J., concurring). As the concurrence explained, the "problem" with the sweeping declaration in *Pitts* "is that virtually every 'policy' in a district attorney's office has *some* relationship to the prosecution of crimes." *Id.* (emphasis in original). In Judge Reinhardt's view, it would be contrary to the purposes of Section 1983 and *Monell* if all policies remotely related to prosecutions were treated as state functions because then it would be virtually impossible to hold accountable a district attorney's office plagued by systemic failures that cause real harm to the accused. *See also* Section II, *infra*. That, of course, is precisely the issue presented by this case.

Moreover, the *Goldstein* concurrence concluded there is not, in fact, an "insurmountable analytical difficulty," as the *Pitt* Court feared, "to concluding that a county cannot be held liable under section 1983 when the district attorney . . . as an agent of the state, commits prosecutorial misconduct, but can be held liable when

14

the district attorney's hiring, training, and supervision program, which the district attorney undertakes as a local policymaker, results in injury to a person's civil rights." 715 F.3d at 765 (cleaned up). That is, "there can be and is a 'meaningful analytical distinction' between prosecutorial decisions" in particular cases and "the creation of administrative policy or the training of employees" on an office-wide basis. *Id.* (quoting *Pitt*, 17 Cal.4th at 366). For guidance on how to draw that distinction, the *Goldstein* concurrence looked to examples of other courts of appeal doing so across the country. *See id.* (listing cases). This Court should too.

For example, the Second Circuit has squarely held that New York district attorneys' office-wide policies, including training, supervising, and disciplining line prosecutors regarding their constitutional duties, are undertaken on behalf of the locality, not the state. In *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), the Second Circuit explained that, as a matter of federal law, a New York district attorney may prosecute criminal cases on behalf of the state, but "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Id.* at 301. The court held that "management of the office" includes the district attorney's alleged "decision not to supervise or train [attorneys] on *Brady* and perjury issues," *id.*—that is, a policy decision directly related to quintessential prosecutorial functions.

15

The Second Circuit elaborated on this holding in *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), explaining that New York district attorneys and their line prosecutors "are generally presumed to be local county officers." *Id.* at 76. Under a "narrow exception to this general rule," *id.* at 77, a district attorney acts on behalf of the state when they "make[] individual determinations about whether" and how "to prosecute violations of state penal laws." *Id.* In the *Myers* Court's view, anything that is *not* an exercise of prosecutorial discretion in an individual case is necessarily done on behalf of the locality, including the challenged "managerial decision to implement [a] policy" of refusing to accept cross-complaints in criminal cases—even though that policy ultimately impacted the plaintiff's criminal case and, a jury found, violated his rights. *Id.*

The Second Circuit confirmed this distinction in *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019). In that case, the plaintiff alleged that two policies of the Queens County District Attorney's office led to his wrongful conviction: a policy of a "deliberate information barrier . . . that purposefully kept prosecutors unaware" of important information related to certain witnesses and a "failure to discipline [prosecutors'] summation misconduct." *Id.* at 733, 756. The court rejected the government's argument that, because "New York concludes 'prosecutorial' conduct is a state function," and the challenged policies "pertain to" prosecutorial actions, the plaintiff's claims against the municipality could not proceed. *Id.* at 760. Instead,

the Second Circuit reaffirmed the distinction between office management, including *all* policies and trainings, which fall within *Monell*, and specific prosecutorial decisions, which do not. *Id.*

The Third Circuit has likewise concluded that district attorneys in Pennsylvania act as local rather than state officers "when they manage or administer their own offices," which includes training and supervising prosecutorial functions, but not "when they prosecute crimes." *Carter v. City of Phila.*, 181 F.3d 339, 352-53 (3d Cir. 1999) (relying on *Walker*). Like the District Court here, the district court in *Carter* "mischaracterized the basis of [the plaintiff's] claim as a prosecutorial function" even though it did not relate to a "core state function of prosecution" but instead "training/supervision/administrative activities." *Id.* at 351. Reflecting the Third Circuit's influence on the concurrence in *Goldstein*, the *Carter* Court explained: "In dismissing the possibility of a meaningful analytical distinction between a district attorney's prosecutorial and policy-making functions, the District Court adopted a position which would inappropriately pull all functions of the office within the scope of its (purportedly sovereign) prosecutorial function." *Id.* The Third Circuit then enunciated the "obvious basis for distinction" that this Court adopted in *Goldstein* and should reaffirm here: "making and applying county-wide policy" is best understood as "administrative" and "local," even if it touches on prosecutorial

functions, and "carrying out state-wide policy" is best understood narrowly as specifically prosecuting a particular case on behalf of the state. *Id.*

As these cases reflect, the question under *Monell* is not simply whether a policy affects criminal prosecutions—in a district attorney's office, virtually any policy necessarily will. Instead, it is whether a policy or practice of the governmental entity, including one that facilitates (or impedes) compliance with prosecutors' constitutional and statutory duties, caused the plaintiff's constitutional harm.

That question must be answered in the affirmative here. As in the *Baca* case discussed above, Mr. Parker suffered grievous constitutional harm—a lengthy detention for a crime the Riverside County District Attorney's Office knew he did not commit—because the Office tolerates and even encourages the suppression of exculpatory evidence. Consistent with the law of municipal liability under Section 1983, the County should not be permitted to hide behind the Eleventh Amendment.

## II. *MONELL* LIABILITY IS NECESSARY TO DETER AND PREVENT PROSECUTORIAL MISCONDUCT AND TO REMEDY CONSTITUTIONAL VIOLATIONS.

Allowing the County of Riverside to avoid liability here would also be contrary to the purpose of Section 1983. Prosecutorial misconduct can cause the gravest of constitutional injuries—the deprivation of liberty, and in some cases, life, without due process of law. But because individual prosecutors are often absolutely immune from suit, they are largely beyond the reach of the very mechanism designed

to deter and recompense constitutional violations—civil suit under Section 1983. Critically, however, the municipal entities that employ district attorneys enjoy neither qualified nor absolute immunity from suit for constitutional harms caused by their official policies, practices, or customs. Thus, when a plaintiff—like Mr. Parker—can show that his harm stemmed from the unconstitutional practices of the government itself and not from the aberrant acts of one rogue prosecutor, he is entitled to challenge those practices under Section 1983. Municipal liability is always a critical component of Section 1983's enforcement scheme. But it is indispensable in cases such as this one, where, should the individual defendants be granted absolute immunity, the government's blatant disregard for the constitutional rights of its constituents would be otherwise entirely insulated from review.

### A. Civil suit under Section 1983 is the primary mechanism for victims of government abuse to vindicate their rights.

Section 1983 was enacted as part of the Civil Rights Act of 1871 "in response to the widespread deprivations of civil rights in the . . . States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers." *Felder v. Casey*, 487 U.S. 131, 147 (1988) (citations omitted). It created a statutory cause of action against local government officials and entities for their constitutional harms as a means "to 'enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'"

19

*Owen v. Independence*, 445 U.S. 622, 650-51 (1980) (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961). In keeping with this purpose, Congress intended Section 1983's language to be "as broad as can be used" to provide a remedy for *any* constitutional violation. *See* Cong. Globe, 42d Cong., 1st Sess. App. 68, 217 (1871) (statement of Sen. Thurman); *id*. at 317 (statement of Rep. Shellabarger) (stating it would be "monstrous" if Section 1983 were not "liberally and beneficently construed" because it is "remedial and in aid of the preservation of human liberty and human rights"); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982) ("Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual.").

As the Supreme Court has noted, "[a] damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees." *Owen*, 445 U.S. at 651. In providing a damages remedy, Section 1983 serves to promote accountability, deter unconstitutional government action, and actualize the justice promised in the Fourteenth Amendment. *Id*.

### B. Individual prosecutors rarely face legal or professional consequences for their misconduct.

Despite the sweeping language and purpose of Section 1983, the Supreme Court has held that prosecutors are absolutely "immune from a civil suit for damages" for any misconduct committed "in initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). In

justifying its decision, the *Imbler* Court reasoned that there were sufficient safeguards beyond Section 1983 to deter prosecutorial misconduct, including criminal punishment, professional discipline, and disbarment. *Id.* at 419.

Unfortunately, these safeguards have proven illusory. As former-Chief Judge Kozinski has lamented, "Professional discipline is rare, and violations seldom give rise to liability for money damages. Criminal liability for causing an innocent man to lose decades of his life behind bars is practically unheard of." *United States v. Olsen*, 737 F.3d 625, 630 (9th Cir. 2013) (Kozinski, C.J., dissenting from order denying rehearing *en banc*) (citations omitted).[9] And, as Justice White foreshadowed in his *Imbler* concurrence, the effect of absolute immunity has indeed "injure[d] the judicial process." *See* 424 U.S. at 433 (White, J., concurring in the judgment) (disagreeing with extending absolute prosecutorial immunity "to suits based on

---

[9] *See also* Margaret Z. Johns, *Reconsidering Absolute Prosecutorial Immunity*, 2005 B.Y.U. L. REV. 53, 70-72 (2005) (similar); David Keenan et al., *The Myth of Prosecutorial Accountability After* Connick v. Thompson: *Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct*, 121 Yale L.J. Online 203, 210-211 (2001) (explaining that "those in the best position to report [prosecutorial] misconduct—namely judges, other prosecutors, and defense attorneys and their clients—are often disincentivized from doing so for both strategic and political reasons"); Innocence Project, *Prosecutorial Oversight: A National Dialogue in the Wake of* Connick v. Thompson at 17 (Mar. 2016), https://tinyurl.com/448abpvy (explaining that most district attorneys are elected officials and "there is an inherent conflict of interest" in expecting that official to generate "negative publicity and scrutiny of the office" by prosecuting "one of its own").

claims of unconstitutional suppression of evidence" because "such a rule would . . . interfere with Congress' purpose in enacting 42 U.S.C. § 1983, without any support in statutory language or history."). For example, the suppression of exculpatory evidence contributed to the wrongful convictions of 44% of the 2,400 exonerees on the National Registry of Exonerations as of February 27, 2019.[10] And in California, a 2010 study identified 707 cases between 1997 and 2009—an average of about one case per week—in which a state or federal appellate court found prosecutorial misconduct.[11] Despite this high volume of misconduct, discipline falls short: "of the 4,741 public disciplinary actions reported in the *California State Bar Journal*" over this period, "only *10* involved prosecutors, and only *six* of these were for conduct in the handling of a criminal case."[12]

These numbers, though staggering, likely understate the full extent of harm caused by prosecutorial misconduct. First, they only reflect prosecutions that ended in (wrongful) conviction following a jury trial; they do not capture the pre-trial misconduct that Mr. Parker suffered here, nor any misconduct that might have occurred in the many cases resolved through guilty pleas.[13] Further, these numbers

---

[10] *See* Samuel R. Gross, et al., *Government Misconduct and Convicting the Innocent: The Role of Prosecutors, Police and Other Law Enforcement* at 75, The National Registry of Exonerations (Sep. 1, 2020), https://tinyurl.com/58z4wzsn.
[11] Ridolfi & Possley, *Preventable Error*, *supra* 7 n.3, at 3.
[12] *Id.* (emphasis in original).
[13] *Id.*

do not include cases in which the misconduct was not discovered because, as then-Chief Judge Kozinski has pointed out, "If a prosecutor fails to disclose exculpatory evidence to the defense, who is to know?"[14] Mr. Parker's story is a case in point—the individual defendants purposefully "delay[ed] disclosure of evidence helpful to the defense until" Mr. Parker had spent nearly four years in jail for a crime they knew he did not commit, and "no one w[as] the wiser."[15]

### C. Municipal liability is an indispensable check on systemic prosecutorial misconduct and a necessary remedy for plaintiffs like Mr. Parker.

Particularly in light of the limitations on holding individual actors accountable, municipal liability is essential to fulfill the promise of Section 1983 because it encourages government agencies to take proactive measures to institute policies and practices that prevent constitutional harm, and because it ensures that plaintiffs have some recourse when they are the victims of government malfeasance.

As explained in Section I, *supra*, the Supreme Court's landmark decision in *Monell* established that "[l]ocal governing bodies"—not only the individual officers employed by those bodies—"can be sued directly" under Section 1983 where "the action that is alleged to be unconstitutional implements or executes" a governmental "policy," or was undertaken "pursuant to governmental 'custom.'" 436 U.S. at 690-

---

[14] Alex Kozinski, *Preface: Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii, xxiii (2015).
[15] *Id.*

91; *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167 (1970) ("Congress included customs and usages [in Section 1983] because of the persistent and widespread discriminatory practices of state officials"); *id.* ("Even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." (quoting Cong. Globe, 42d Cong., 1st Sess. 153 (1871) (statement of Rep. Garfield))).

*Monell* liability serves Section 1983's dual goals of vindicating the rights of those harmed by official misconduct and preventing the occurrence of constitutional violations in the first instance through the threat of civil liability. *Owen*, 445 U.S. at 651. As explained in *Owen*, "[t]he knowledge that a municipality will be liable for all of its injurious conduct . . . should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Id.* at 651-52. The threat of civil liability also encourages municipal policymakers to take proactive steps, like "institut[ing] internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights." *Id.* at 652.[16] Otherwise, a municipality could

---

[16] *See also* Mark C. Niles, *Deliberate Indifference: Respondeat Superior Liability for Municipalities in Civil Rights Cases as an Alternative to Qualified Immunity Reform*, 25 N.Y.U. J. Legis. & Pub. Pol'y 387, 420 (2023) (similar).

be liable for its *failure* to prevent or respond to instances of misconduct and prosecutorial overreach, even if individual prosecutors may be immune themselves.

Where a government entity perceives itself to be beyond the reach of Section 1983, however, as the Riverside County District Attorney's Office apparently does, these incentives are flipped. Because the heads of district attorney's offices, like Defendant Zellerbach, can be absolutely immune from suit for even the most egregious and intentional constitutional violations, they have every incentive to pursue conviction at all costs, and no incentive to respect the constitutional rights of the accused. *See Olsen*, 737 F.3d at 630 (Kozinski, C.J., dissenting from order denying rehearing *en banc*) ("[A]ll the incentives prosecutors confront encourage them not to discover or disclose exculpatory evidence[,] . . . create[ing] a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice."). These perverse incentives encourage district attorneys, like Defendant Zellerbach, to then institute office-wide policies and practices that optimize securing convictions at the expense of the due process rights of the accused.

Of course, district attorney's offices do not enjoy the absolute immunity granted to their officers. *See Connick*, 563 U.S. at 61. Extending individual-officer immunities to the government itself would run afoul of the purpose of Section 1983 to provide a damages remedy for constitutional wrongdoing because "the importance of assuring [that remedy's] efficacy is only accentuated when the wrongdoer is the

institution that has been established to protect the very rights it has transgressed." *Owen*, 445 U.S. at 650-51. Moreover, in cases such as this one, where the individual officers may be immune from suit, "many victims of municipal malfeasance would be left remediless if the c[ounty] were also allowed to assert" immunity and other defenses available to individuals. *Id*. "[T]he injustice of such a result," in the eyes of the Supreme Court, "should not be tolerated." *Id*.

Knowing this, the County of Riverside instead seeks the shield of sovereign immunity, bestowed upon states—not municipalities—by the Eleventh Amendment. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979). As discussed in Section I, *supra*, the District Court's grant of sovereign immunity to the County of Riverside rests on an erroneous reading of the controlling law. It is also deeply troubling as a matter of public policy.

If left to stand, the District Court's decision would place the Riverside County District Attorney's Office—and its rampant, longstanding misconduct, *see* Section I(A), *supra*—entirely beyond reproach. This Court, charged with the authority and duty to maintain the rule of law, would be powerless to put an end to the County's flagrant disregard for the due process rights of criminal defendants. The doctrine of sovereign immunity cannot be stretched so far as to completely shut out judicial review of a municipal entity, especially one as powerful as a district attorney's office.

26

With good reason, the Supreme Court explicitly denounced this result in *McMillian*—the very case upon which the County of Riverside relies in asserting immunity. In *McMillian*, the plaintiff's only theory of municipal liability under *Monell* rested upon a single incident of the county sheriff's alleged misconduct. 520 U.S. at 784. As a result, the sheriff's status as policymaker for the state, rather than the county, disposed of the plaintiff's *Monell* claim. *Id.* at 783. But the *McMillian* Court clarified that its rule had no bearing on *Monell* claims alleging—as Mr. Parker alleges here—widespread, longstanding misconduct rather than a single instance of a municipal policymaker's misconduct. *See id.* at 796. The Court dismissed the concern that local governments could manipulate *McMillian*'s rule to shield themselves entirely from liability because "such efforts [we]re already foreclosed by" precedent: "Egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by allowing plaintiffs to prove that a widespread practice has been established by custom or usage with the force of law." *Id*. (cleaned up).

Ignoring the limits of *McMillian*, the decision below runs afoul of Section 1983 by shielding the Riverside County District Attorney's Office—the very government entity we have entrusted to "promot[e] . . . justice [and] fair and equal treatment"—from all liability "for the injury it has begotten." *Owen*, 445 U.S. at 651. The stakes could not be higher: If shielded from all judicial inquiry, the Office will,

27

as former Chief Judge Kozinski predicted, continue its top-down policy of suppressing exculpatory evidence, at great peril to the lives and liberty of the individuals it is sworn to serve.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's order dismissing Mr. Parker's case with prejudice and remand for further proceedings.

Date:  February 6, 2025

/s/ Hannah M. Kieschnick
Hannah M. Kieschnick
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612

/s/ Eliana Machefsky
Eliana Machefsky
NATIONAL POLICE ACCOUNTABILITY
    PROJECT
P.O. Box 2981
Berkeley, CA 94702

/s/ Summer Lacey
Summer Lacey
Jacob Reisberg
ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA
1313 West Eighth St.
Los Angeles, CA 90017

*Attorneys for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number:** <u>No. 24-5602</u>

I am the attorney or self-represented party.

**This brief contains <u>6,500</u> words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: <u>/s/ Hannah M. Kieschnick</u>        **Date:** <u>February 6, 2025</u>