24-5602

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ROGER WAYNE PARKER,

*Plaintiff & Appellant,*

*v.*

COUNTY OF RIVERSIDE, ET AL.,

*Defendant & Appellee.*

---

On Appeal from the United States District Court
for the Central District of California
21-cv-01280-JGB-DTB
Jesus G. Bernal, District Judge

---

**Appellant's Reply Brief**

---

Leslie A. Brueckner (CA 140968)*
Kimberly (Trimble) Hutchison (CA 288682)
SINGLETON SCHREIBER, LLP
591 Camino De La Reina, Ste. 1025
San Diego, CA 92108
(619) 573-1851*
*lbrueckner@singletonschreiber.com*
*khutchison@singletonschreiber.com*

*Counsel for Plaintiff & Appellant*
ROGER WAYNE PARKER

TABLE OF CONTENTS

Introduction..........................................................................................1

Argument ...........................................................................................1

I.  Plaintiff's *Monell* claim is viable because
    Defendant Zellerbach acted as a county official when
    he applied his office's unconstitutional policy of
    wrongfully withholding exculpatory evidence
    to Mr. Parker's prosecution..................................................1

    A.  This case is on all fours with *Goldstein.*..........................2

    B.  Authority from other Circuits is instructive
        here....................................................................................9

    C.  The district court's ruling effectively guts
        *Monell.*...........................................................................14

II. Plaintiff's *Tatum-Lee* due process claim for
    withholding exculpatory evidence is viable against
    prosecutors. ........................................................................18

    A.  *Lee* established that "a detainee has a
        constitutional right to be free from continued
        detention after it was or should have been
        known that the detainee was entitled to
        release." ............................................................................19

    B.  *Tatum* applied *Lee* to hold that a detainee held
        for an unusually long period due to the
        withholding of "highly significant" exculpatory
        evidence has a viable section 1983 due process claim..........21

    C.  The Ninth Circuit's reasoning in *Tatum* and *Lee*
        rebuts Defendants' proposed distinction between
        officers and prosecutors. ......................................................23

III. The individual defendants are not entitled to qualified
     immunity. ...........................................................................27

IV.  The individual defendants are not entitled to absolute
     immunity. ............................................................................. 31

V.   At a minimum, Mr. Parker should be granted leave to
     amend to clarify his *Monell* claim. ................................. 34

Conclusion .................................................................................... 37

Certificate of Service .................................................................... 38

Certificate of Compliance ............................................................ 39

T<span>ABLE OF</span> A<span>UTHORITIES</span>

# Cases

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ......................................................... 30

*Baez v. Hennessy,*
    853 F.2d 73 (2d Cir. 1988) .............................................. 11

*Baker v. McCollan,*
    443 U.S. 137 (1979) ................................................. *passim*

*Broam v. Bogan,*
    320 F.3d 1023 (9th Cir. 2003)......................................... 32

*Buckley v. Fitzsimmons,*
    509 U.S. 259 (1993) ......................................................... 32

*Carter v. City of Philadelphia,*
    181 F.3d 339 (3d Cir. 1999)......................................... 9, 13

*Carvalho v. Equifax Info. Servs., LLC,*
    629 F.3d 876 (9th Cir. 2010)........................................... 35

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001)......................................... 31

*Esteves v. Brock,*
    106 F.3d 674 (5th Cir. 1997)............................................. 9

*Ying Jing Gan v. City of New York,*
    996 F.2d 522 (2d Cir. 1992) ............................................. 9

*Garmon v. County of Los Angeles,*
    828 F.3d 837 (9th Cir. 2016)........................................... 33

*Gentile v. County of Suffolk*,
    926 F.2d 142 (2d Cir. 1991) ...................................................... 10, 13

*Goldstein v. City of Long Beach*,
    715 F.3d 750 (9th Cir. 2013) ................................................. *passim*

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ................................................................ 32, 34

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) .................................................. *passim*

*Myers v. County of Orange*,
    157 F.3d 66 (2d Cir. 1998) ....................................................... 10, 11

*Owens v. Fulton Cnty.*,
    877 F.2d 947 (11th Cir. 1989) ............................................................ 9

*Pitts v. County of Kern*,
    949 P.2d 920 (Cal. 1998) ..................................................................... 8

*Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of
    Health & Human Servs.*,
    946 F.3d 1100 (9th Cir. 2020) .......................................................... 27

*Puckett v. County of Sacramento*,
    No. 2:22-CV-00350-KJM-DB,
    2023 WL 2432919 (E.D. Cal., Mar. 9, 2023) ................................... 37

*Tatum v. Moody*,
    768 F.3d 806 (9th Cir. 2014) .................................................. *passim*

*Van de Kamp v. Goldstein*,
    555 U.S. 335 (2009) ....................................................................... 5, 6

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992) .................................................. *passim*

## State Constitutional Provisions

Cal. Article V § 13 ............................................................................ 11, 12

## Statutes

42 U.S.C. § 1983 ................................................................................ 10

Cal. Gov. Code § 12550 ..................................................................... 11

Cal. Gov. Code § 24000 ..................................................................... 11

N.Y. Exec. Law § 63 ..................................................................... 11, 12

## Federal Rules

Fed. R. Civ. P. 15 .............................................................................. 35

## Other Authorities

California Commission on the Fair Administration of Justice, Final
Report 186 (2008) ...................................................................... 3, 4

## INTRODUCTION

Plaintiff/Appellant Roger Parker spent nearly four years in jail at the hands of the Riverside County District Attorney's Office for a murder prosecutors knew he did not commit.

Defendants do not dispute this fact. Nor do they acknowledge the harm they inflicted on this innocent man.

Instead, they seek to shield themselves by advancing a series of arguments that do not withstand scrutiny—as explained below.

## ARGUMENT

**I.    Plaintiff's *Monell* claim is viable because Defendant Zellerbach acted as a county official when he applied his office's unconstitutional policy to Mr. Parker's prosecution.**

Defendants argue that Mr. Parker's *Monell* claim is not cognizable because "Zellerbach, in his capacity as Riverside County District Attorney, acted as a … State official when he decided to proceed with Parker's criminal prosecution, despite his alleged knowledge of exculpatory evidence." Appellees' Answer Br. ("AAB") at 29-30.

This is incorrect. As Plaintiff has argued, the Riverside County District Attorney's Office represented the county, not the State, when it

1

established personnel practices that frustrated line attorneys' ability to comply with their constitutional obligation to disclose "compelling exculpatory evidence." Appellants' Opening Br. ("AOB") at 36-42.

These allegations sweep far more broadly than Mr. Parker's individual case and are properly viewed as the type of office-wide administrative policy that, under *Goldstein v. City of Long Beach,* 715 F.3d 750 (9th Cir. 2013), can give rise to liability under *Monell.*

None of Defendants' arguments to the contrary withstands scrutiny.

## A.     This case is on all fours with *Goldstein.*

Defendants first argue that *Goldstein* "makes clear [that] policy and training regarding withholding of exculpatory evidence is still a central part of the prosecutorial function[,] not an administrative function"—and thus any such policy or training constitutes an action of the State, not the county. AAB34 (emphasis omitted).

But *Goldstein* says no such thing. There, this Court considered "whether a district attorney acts as a local or a state official when establishing policy and training related to the use of jailhouse informants." 715 F.3d at 752. *Goldstein* held that district attorneys act

2

on behalf of the municipalities that employ them, not the State, when the challenged conduct involves office management or "administrative oversight of systems used to help prosecutors comply with their constitutional duties." *Id.* at 762 (citations omitted).

While *Goldstein* focused on one system—policies and training regarding the jailhouse informants in criminal prosecutions—the Court's ruling is not limited to that context. Instead, *Goldstein* stands for the broader proposition that the creation and maintenance of policies, practices, trainings, and other tools designed to facilitate prosecutors' compliance with their constitutional duties is an administrative, and thus local, function.

We know that's true because, as part of its analysis, *Goldstein* looked to a 2008 report by the California Commission on the Fair Administration of Justice, which recommended that every district attorney's office "adopt a written internal policy, wherever feasible, to govern the use of in-custody informants." *Id.* at 759-60 (citing California

Commission on the Fair Administration of Justice, Final Report 186 (2008) ("Commission Report")).[1]

Importantly, as explained in further detail below, the Commission Report makes similar recommendations regarding the use of exculpatory information. *See id.* at 85-91. The Report makes clear that *Goldstein*'s conclusion that office-wide policies regarding the use of confidential informants are "local, not statewide, determinations" is equally applicable to office-wide policies regarding the treatment of exculpatory evidence. *See Goldstein*, 759 F.2d at 758; Commission Report at 85-87.

**With regard to confidential informants,** the Commission Report recommended that "each District Attorney's office in the State of California adopt a written policy" requiring, inter alia, that:

1.    The decision to use the testimony of an in-custody informant "be reviewed and approved by supervisory personnel other than the deputy [prosecutor] assigned to the trial of the case";

---

[1] The Commission Report is available at [*California Commission on the Fair Administration of Justice Final Report](). The Report's discussion of policies regarding informant testimony is at 43-50, and the discussion of policies regarding exculpatory evidence is at 85-91.

2.    "The maintenance of a central file preserving all records relating to contacts with in-custody informants, whether they are used as witnesses or not";

3.    "The recording of all interviews of in-custody informants conducted by the District Attorney personnel"; and

4.    "The corroboration of any testimony of an in-custody informant by evidence which independently tends to connect the defendant with the crime …"

*Id.* at 49.

The Commission Report also recommended that "all prosecutors, defense lawyers, judges and police investigators in California receive training with respect to the perils of using arrested or charged informants as witnesses." *Id.* at 47.

There can be no doubt that these policies and trainings, while administrative in nature, have an impact on individual prosecutions, because they directly impact the use of in-custody informants as witnesses in trial. As the U.S. Supreme Court stated in *Van de Kamp v. Goldstein*, 555 U.S. 335, 339 (2009), Goldstein's claims "focus upon a certain kind of administrative obligation—*a kind that itself is directly connected with the conduct of a trial*." *Id.* (emphasis added).[2]

_____

[2] *Van de Kamp v. Goldstein* is how *Goldstein* was captioned in the U.S. Supreme Court prior to remand to this Court.

5

Based on that finding, the Supreme Court found that the district attorneys who prosecuted Goldstein had absolute immunity from suit. *Id.*; *see also Goldstein*, 715 F.3d at 752 (discussing Supreme Court's ruling).

But on remand, this Court held in *Goldstein* that these administrative policies can be challenged under *Monell* because they are local policies, not policies of the State, ***even though*** they are "directly connected with the conduct of a trial." *Id.* (quoting *Van de Kamp*, 555 U.S. at 339).

On this point, *Goldstein* found it "instructive" that the Commission Report's recommendations were directed at local district attorney's offices rather than the legislature or Attorney General, holding that "this similarly suggests that, at least up to this point, district attorney office policies related to informants have been addressed by the individual offices rather than by the state." *Id.* at 759.

**With regard to exculpatory evidence**, the Commission Report recommended that district attorney's offices, not the legislature or Attorney General, "formulate and disseminate a written Office Policy ***to***

6

**govern Brady *compliance*.**" Commission Report at 85 (emphasis added).

The Report specifically recommended that each district attorney office should, inter alia:

1.    Create and disseminate a written policy providing "for gathering *Brady* material in a systematic fashion … [and] provid[ing] that material relevant to factual innocence or an affirmative defense be disclosed as soon as that determination is made…" (*id.* at 90);

2.    create and maintain "a list … contain[ing] the names of police officers and other recurring witnesses who whom there is information that may be subject to disclosure requirements under *Brady"* (*id.*); and

3.    conduct training programs "to assure that all deputy district attorneys understand and apply office policies and procedures with regard to *Brady* disclosure…" *Id.* at 91.

Just as with the policies and trainings the Commission recommended as to the use of confidential informants, all these policies regarding *Brady* compliance are administrative in nature, ***even though they have an impact on prosecutorial strategy in any given case***.

\*   \*   \*

The foregoing should make clear why Defendants are wrong when they argue that policies regarding exculpatory evidence are necessarily a function of the State because they affect prosecutorial strategy. *See,*

7

*e.g,* AAB31. The administrative policies recommended in the Commission Report regarding the use of confidential informants **also** directly relate to prosecutorial strategy—yet *Goldstein* found that such policies are functions of the county, not the State.

Moreover, *Goldstein* expressly **declined** to adopt the reasoning of the California Supreme Court in *Pitts v. County of Kern*, 949 P.2d 920 (Cal. 1998), which held that a district attorney acted for the State, not the county, "when preparing to prosecute and when prosecuting crimes, and when establishing training and developing policies for employees in these areas." *Goldstein*, 17 F.3d at 761 (quoting *Pitts*, 949 P.2d at 923). Defendants here argue that any policy or training that has an impact on individual prosecutions is necessarily a State function, but that's precisely what *Pitts* held—and what *Goldstein* expressly rejected.

*Goldstein*'s reasoning thus applies with equal force to the type of office-wide policy that Mr. Parker challenges here—i.e., a de facto policy of pursuing conviction at all costs, including by the withholding of exculpatory evidence. 2-ER-44-45. Because that practice and custom is a local function, not a State function, the Riverside County District Attorney's office is amenable to suit under *Monell*.

8

**B. Authority from other Circuits is instructive here**.

As previously explained, decisions from the Second and Third Circuits strongly support the conclusion that Zellerbach acted as a county official here. *See* AOB42-44 (discussing *Carter v. City of Philadelphia*, 181 F.3d 339, 343 (3d Cir. 1999); *Walker v. City of New York*, 974 F.2d 293, 295, 298 (2d Cir. 1992); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1992).)[3]

The Second Circuit's decision in *Walker* is particularly analogous.

There, as here, the plaintiff spent "years in prison for a crime that it now appears he did not commit." *Walker*, 974 F.2d at 294. And in *Walker*, the prosecutors "covered up exculpatory evidence … in order to insure Walker's conviction despite their knowledge of 'probable innocence.'" *Id*.

---

[3] Judge Rheinhart cited *Walker* and *Carter* in *Goldstein*, noting that "several circuits have come to the same conclusion that we reach here, that district attorneys act as county officers when deciding administrative policy and procedures related to training or supervision, even though they act as state officers when conducting prosecutions." 515 F.3d at 765 (Rheinhart, J., concurring) (citing *Walker*, 974 F.2d at 296; *Carter*, 181 F.3d at 352; *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir.1997); *Owens v. Fulton Cnty.*, 877 F.2d 947, 952 (11th Cir.1989)).

After winning his release, Walker sued New York City under 42 U.S.C. § 1983, alleging that "the City should have trained police officers and ADAs not to commit or suborn perjury and not to suppress exculpatory evidence." *Id*. at 295. As Defendants argue here, the City in *Walker* argued that "the district attorney is a state official, and therefore his deliberate indifference cannot trigger municipal liability." *Id*. at 301.

The Second Circuit disagreed, citing its earlier holding in *Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir.1991), that "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Id*. at 301.

Defendants have no good answer to *Walker*.

They first try to defuse *Walker* by suggesting (without citing any authority) that New York and California law differ as to whether policies relating to suppression of exculpatory evidence are made by the county or the State. *See* AAB37-38. In reality, New York law is strikingly similar to California law on this point.

As the Second Circuit observed in *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), New York district attorneys are defined as local,

10

not state officers. *Id.* at 76 (citing, inter alia, N.Y. Pub. Off. Law § 2 (defining district attorneys as "local officer[s]," not "state officer[s]")). The same is true in California. *See Goldstein*, 715 F.3d at 755 (citing, inter alia, Cal. Gov. Code § 24000 ("[t]he officers of a county [include] [a] district attorney].")).

In both California and New York, moreover, prosecutions are brought on behalf of the State and in the name of the people of the State. The State of New York (through the Governor) "may require the State Attorney General to take over the prosecution of any local criminal actions" and thereby perform all acts that the "district attorney would otherwise be authorized or required to exercise or perform." *Baez v. Hennessy*, 853 F.2d 73, 76 (2d Cir.1988) (quoting N.Y. Exec. Law § 63(2)).

Likewise, in California, if the Attorney General believes a district attorney is not adequately prosecuting crime, the Attorney General "may step in and 'prosecute any violations of law' himself or herself." *Goldstein,* 715 F.3d at 757 (citing Cal. Const. art. V, § 13; Cal. Gov. Code § 12550). If the Attorney General does step in to conduct a prosecution, "in such cases the Attorney General shall have all the

11

powers of a district attorney." *Id.* at 757 (quoting Cal. Const. art. V, § 13).

Unlike in California, however, "whenever in his judgment the public interest requires it," the New York Attorney General may, with the approval or at the direction of the Governor, "inquire into matters concerning the public peace, public safety and public justice" and, for such purpose, "may, in his discretion, and without civil service examination, appoint and employ, and at pleasure remove, such deputies, officers and other persons as he deems necessary" to effectuate this activity." N.Y. Exec. Law § 63.

This effectively gives the New York Attorney General the power to assume the full powers of the District Attorney should he so choose. That power is ***not*** granted to the California Attorney General.

In light of the foregoing, *Walker* cannot be distinguished on state-law grounds, because New York law gives even ***more*** power to the Attorney General to control prosecutions, and yet the Second Circuit views New York district attorneys as local policy makers when adopting or implementing internal policies related to prosecutions. *See Walker*, 974 F.2d at 301.

12

Defendants also try to distinguish *Walker* on the ground that, there, "the City conceded that no City official has veto authority over training or supervision decisions by the county district attorney,' which was also an aspect of *New York* law and policies, *not* California's." AAB37 (citing *Walker*, 974 F.2d at 301).

That concession has no bearing here because it related to the City's attempt to distinguish *Gentile*, *supra*, 926 F.2d 142, on the ground that New York *City*, unlike Kings *County*, is a state actor when setting office policies. In this case, however, the question is whether Riverside County acted as a *county* policymaker when creating and perpetuating its unconstitutional custom and practice of pursuing convictions at all costs—and *Walker* tells us the answer is yes.

Defendants also attempt to distinguish *Walker* (and the Third Circuit's decision in *Carter*, 181 F.3d at 343) on the ground that both cases "were based on a failure to supervise and train prosecutors on *Brady* issues," whereas this case involves "a discretionary decision in a particular case: Parker's." AAB38.

This argument mischaracterizes Plaintiff's complaint, which alleges an affirmative custom and practice of, among other things,

withholding exculpatory evidence from the defense. 2-ER-44-45. Just as in *Walker*, that affirmative custom and practice does not just relate to Plaintiff, but constitutes a longstanding office culture that relates to all prosecutions. *Walker* makes clear that a municipality acts as the county, not the State, in creating and perpetuating such a culture—and thus Riverside County is amenable to suit under *Monell*.

## C. The district court's ruling effectively guts *Monell*.

Defendants also accuse Plaintiff of erecting a "straw man" in arguing that the district court's approach "would immunize every office-wide policy in a prosecutor's office from *Monell* liability, rendering such liability a dead letter." AAB40 (quoting AOB49) (emphasis omitted). According to Defendants, the district court's approach still allows for *Monell* liability to be imposed for office-wide policies that are not "directed related to a prosecutorial function," like the informant policy at issue in *Goldstein*. AAB41.

Defendant's contention mischaracterizes Plaintiff's argument—and it misses the point.

Plaintiff's argument was directed at the district court's broad holding that, "even if [Mr. Parker] alleged that Defendant Zellerbach

failed to establish policies and training on the disclosure of exculpatory evidence, those policies and training would be related to prosecutorial functions"—and thus are not cognizable under *Monell*. 1-ER-11.

That cannot be correct because, as Judge Rheinhardt pointed out in *Goldstein*, "virtually every 'policy' in a district attorney's office has some relationship to the prosecution of crimes." 715 F.3d at 763 (Rheinhardt J., concurring). That being so, the district court's analysis here ***would***, literally applied, "immunize every office-wide policy in a prosecutor's office from *Monell* liability, rendering such liability a dead letter." AOB49 (emphasis omitted).

To be sure, *Goldstein* itself attempted to walk a finer line, holding that certain office-wide "administrative" policies *are* cognizable under *Monell*. But, importantly, *Goldstein* enunciated that test in a case involving a policy that had just as much an impact on individual prosecutions as a policy relating to the use of exculpatory evidence. Defendants here try to argue that the policy at issue in *Goldstein* was just about list-making. In reality, it was far broader and encompassed policies and trainings regarding the use of confidential informants that have an impact on individual prosecutions.

15

The district court here read *Goldstein* too narrowly, assuming that any policy that has an impact on individual prosecutions falls outside the decision's scope. That cannot be right, because policies relating to the use of confidential informants can have just as much impact on individual prosecutorial decisions as policies relating to the handling of exculpatory evidence—yet *Goldstein* itself held that such policies *can* be the basis of a *Monell* claim.

Plaintiff submits that, in light of the foregoing, what is needed is clarification that office-wide policies (and trainings and customs and practices) that result in unconstitutional deprivations are cognizable under *Monell* ***even if they have an impact on prosecutorial strategy***.

As *amici* eloquently put it, the question under *Monell* should not be "simply whether a policy affects criminal prosecutions—in a district attorney's office, virtually any policy necessarily will." American Civil Liberties Union Foundation Brief ("ACLU") Br. at 18. Instead, the question should be whether a policy or practice of the governmental entity, including one that facilitates (or impedes) compliance with

prosecutors' constitutional duties, caused the plaintiff's constitutional harm.

This framing is consistent with *Goldstein*—and, indeed, it is exactly the approach used in the Second Circuit under *Walker* and progeny.

That approach is also the only way to give effect to the policy concerns underlying Section 1983 and *Monell* itself.

As Plaintiff's *amici* argue (*see* ACLU Br. at 19), particularly in light of the strict limitations on holding individual actors in the criminal proceedings accountable (due to broad doctrines of absolute and qualified immunity), it is crucially important that when a plaintiff—like Mr. Parker—can show that his harm stemmed from the unconstitutional practices of the *government itself* and not from the aberrant acts of one rogue prosecutor, he is allowed to challenge those practices under Section 1983. Absent such liability, there is nothing to deter the type of widespread prosecutorial misconduct that has been the focus of much concern in recent years. *See id.* at 21-23 (citing statistics and studies).

As *amici* contend, "[i]f left to stand, the District Court's decision would place the Riverside County District Attorney's Office—and its rampant, longstanding misconduct … entirely beyond reproach." *Id.* at 26. That result should not be tolerated, particularly in light of the egregious mistreatment suffered by Mr. Parker in this case.

Accordingly, this Court should reverse the district court's holding on *Monell* and clarify that where, as here, an office-wide policy or practice or custom allegedly causes constitutional harm, it can be challenged under *Monell* even if the policy, practice, or custom has an impact on prosecutorial strategy.

## II. Plaintiff's *Tatum-Lee* due process claim for withholding exculpatory evidence is viable against prosecutors.

Defendants argue that Plaintiff's *Tatum-Lee* due process claim[4] fails because, they contend, a due process claim for prolonged detention based on nondisclosure of exculpatory evidence is only viable if it was caused by investigating *officers*' failure to disclose that exculpatory

---

[4] The claim takes its name from *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), and *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001).

evidence to prosecutors—and here the withholding of exculpatory evidence was done by *prosecutors*, not police.

The district court rejected this argument in its Order Granting-in-Part and Denying-in-Part Defendants' Motion to Dismiss. 2-ER-23. Calling Defendants' argument "nonsensical," the court concluded that Mr. Parker "alleges the same harm and violation of constitutional rights contemplated by *Tatum*[ ] and sufficiently alleges that his prolonged detention was caused by the withholding of exculpatory evidence with deliberate indifference to his rights. As the Court understands, these are the key elements of a *Tatum-Lee* claim." 2-ER-23.

This holding was correct, as explained below.

**A.** *Lee* **established that "a detainee has a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release."**

In *Lee*, the Ninth Circuit identified a constitutional right for a detainee, in the context of a due process claim under § 1983, to be free from detention once the evidence of his innocence comes to light. *See Lee*, 250 F.3d 668.

In that case, a mother brought suit based on the wrongful arrest, extradition, and incarceration of her mentally disabled son Kerry Sanders, who had been incorrectly identified as the fugitive Robert Sanders. *Id*. at 676.

The district court dismissed her due process claim based on his wrongful prolonged incarceration. *Id*. at 683.

This Court reversed, holding that "the loss of liberty caused by an individual's mistaken incarceration after the lapse of a certain amount of time gives rise to a claim under the Due Process Clause of the Fourteenth Amendment." *Id*. (quotations and citation omitted). That is because "a detainee has a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id*. (quotations and citations omitted).

Notably, *Lee* defined the issue as a constitutional right held by the *detainee* against continued detention where government actors are on notice of the detainee's innocence. Although the defendants in *Lee* happened to be officers and personnel employed by the New York Department of Corrections, this Court did not view the constitutional question through the lens of what type of defendant perpetuated the

20

detention. Instead, the Court focused on whether the government actors acted with "deliberate indifference" and "reckless disregard" to the detainee's "due process rights under the Fourteenth Amendment." 250 F.3d at 683-85.

> **B.** **Tatum** applied **Lee** to hold that a detainee held for an unusually long period due to the withholding of "highly significant" exculpatory evidence has a viable section 1983 due process claim.

In *Tatum v. Moody*, the Ninth Circuit applied *Lee* to the context of a detainee held in pretrial confinement while government actors withheld evidence of his innocence. 768 F.3d 806. Specifically, the lawsuit in *Tatum* asserted a due process claim based on Michael Walker's pretrial detention for over 27 months before police officers finally turned over crucial evidence to the prosecutor, who then dismissed the charges against him. *Id*. at 813.

*Tatum* affirmed the jury's verdict in favor of the plaintiff, holding that the defendants were liable under Section 1983 for "(1) acting with deliberate indifference to, or reckless disregard for, Walker's rights or for the truth, in (2) withholding or concealing evidence that (3) strongly indicated Walker's innocence of the crimes for which he was held, and

was reasonably likely to have resulted in dismissal of the charges against him if revealed." *Id*. at 808-09.

In upholding the finding of a constitutional violation, *Tatum* reiterated that this type of claim—arising from the prolonged pretrial incarceration of a person who never ultimately suffers a conviction—is covered by the due process clause of the Fourteenth Amendment. *Id*. at 816 (citing *Lee*, 250 F.3d at 683-85, and *Baker v. McCollan*, 443 U.S. 137, 145 (1979)).

As the district court observed, the parallels between *Tatum* and this case are obvious. 2-ER-23. Neither Mr. Parker nor his lawyer knew that Womack—the person present at the scene of the murder when police arrived—had confessed to the murder during recorded jail phone calls. This is because Defendants withheld the information while Mr. Parker remained in pretrial detention for another six months. When the line prosecutor discovered the confession and informed his supervisor, the supervisor (1) refused to dismiss the case, and (2) ordered the line prosecutor to not disclose the recording to Mr. Parker's attorney. *See* AOB11-12.

Defendants argue that this misconduct cannot support liability because the egregious withholding of the confession was committed by prosecutors instead of police officers. AAB22. But as the district court held, "[t]he right contemplated by *Tatum* and *Lee* is a detainee's 'constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release,' not a prosecutor's right to information." 2-ER-23 (citing *Lee*, 250 F.3d at 683).

As explained below, moreover, *Tatum*'s analysis shows that the due process right recognized in *Tatum* is arguably even more important with respect to prosecutors.

## C. The Ninth Circuit's reasoning in *Tatum* and *Lee* rebuts Defendants' proposed distinction between officers and prosecutors.

In *Tatum*, the Ninth Circuit emphasized the "narrowness of the constitutional rule we enforce today," stating that the rule "is restricted to detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks." *Id.* at 819-20.

23

In their brief, Defendants latch onto this introductory language (*see* AAB22), but they ignore the Court's actual explanation for each of the three significant limitations.

Regarding the first limitation, *Tatum* addressed why this type of due process violation is viable only when there has been a detention of unusual length. *See Tatum*, 768 F.3d at 820. The Court noted that a 217-day detention, and even a 68-day detention, had previously been held to be of sufficient length to "carr[y] constitutional implications." *Id.*

This analysis reinforces the viability of Parker's claim against Defendants here, especially given that his extra six months of detention—after Defendants obtained the exonerating confession—was far greater than the 68-day detention referenced in *Tatum*. *Id.* In total, Mr. Parker spent 3 years, 11 months, and 17 days as an innocent man behind bars. AOB6; 2-ER-23.

Addressing the second limitation, *Tatum* explained this type of due process claim is triggered by "the failure to disclose evidence that is not merely material but strongly indicative of the plaintiff's innocence." 768 F.3d at 820.

Again, this analysis supports Mr. Parker's cause of action, because *Tatum*'s focus was on the strength of the withheld evidence, not the identity of the government actor who withheld the evidence. As the district court put it, "[t]he prosecutors did not suffer harm from the failure to disclose evidence—the wrongly detained plaintiff did." 2-ER-23.

In the present case, moreover, Womack's bombshell confession carried the same heavy weight of exoneration as in *Tatum*. After Mr. Parker discovered the Womack confession and referenced it to the Superior Court on a petition to seal and destroy his arrest records, the Superior Court made the necessary finding that Parker was factually innocent of the charges. AOB13-14; 2-ER-33.

Addressing the third limitation pertaining to the defendant's mental state, *Tatum* explained that "official conduct violates due process only when it shocks the conscience." 768 F.3d at 820 (citations and quotations omitted).

This requirement reflects the reality that officers sometimes need to make "a snap judgment because of an escalating situation," which may not allow for deliberation and therefore should only allow for

25

liability if the defendant had "act[ed] with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* at 821 (quotations and citation omitted). But, the Court reasoned, "the decision whether to disclose or withhold exculpatory evidence is a situation in which actual deliberation is practical, such that deliberate indifference to individual rights— rather than intent to injure—is enough." *Id.* (citations and quotations omitted).

Importantly, *Tatum*'s discussion of "a situation in which actual deliberation is practical" applies with even ***greater force*** to prosecutors than to investigating officers, who have a keen awareness that, if they withhold exonerating evidence from a criminal defendant sitting in pretrial detention, they do so "with knowledge that harm will result." *Id.* (quotations and citation omitted).

As the district court put it, "[t]he prosecutors here, as attorneys experienced in criminal law, were in fact better positioned than police officers to 'underst[and] the risks to the plaintiff's rights from withholding the information"—namely, that Plaintiff would remain unjustly detained." 2-ER-23 (quoting *Tatum*, 768 F.3d at 820).

26

In sum, as the district court stated, "[i]t is nonsensical to hold that because prosecutors and not investigating officers allegedly withheld exculpatory evidence, Plaintiff cannot state a [*Tatum-Lee*] claim." 2-ER-23. Defendants' arguments to the contrary should be rejected.

## III. The individual defendants are not entitled to qualified immunity.

Defendants also argue that the individual prosecutors have qualified immunity because the *Tatum-Lee* claim was not "clearly established" at the time of Mr. Parker's detainment. AAB25-28.

As a threshold matter, this argument should not be considered at all because the trial court never reached the issue of qualified immunity. *See Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health & Human Servs.* (9th Cir. 2020) 946 F.3d 1100, 1110 (9th Cir. 2020) ("[i]n general, an appellate court does not decide issues that the trial court did not decide.").

But if the Court elects to decide this issue, it should reject Defendants' argument because Mr. Parker's due process claim was clearly established in the law at the time of his wrongful detention. under both *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), and *Baker v. McCollan*, 443 U.S. 137 (1979).

27

In *Baker*, Leonard Baker, the plaintiff, was arrested and detained in over the New Year's holiday based on a warrant issued for his brother. 443 U.S. at 141, 145.

The U.S. Supreme Court held the detention did not violate the Constitution because "a detention of three days over a New Year's weekend does not and could not amount to such a deprivation." *Id*. at 145. The Court observed, however, that "one in [plaintiff's] position could not be detained indefinitely in the face of repeated claims of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Id*. at 144.

In *Lee*, this Court quoted *Baker* as "explain[ing] that … 'mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty ... without due process of law." 250 F.3d at 684 (quoting *Baker*, 443 U.S. at 145) (cleaned up)).

Based on that, *Lee* held that that "the loss of liberty caused by an individual's mistaken incarceration after the lapse of a certain amount of time gives rise to a claim under the Due Process Clause of the

Fourteenth Amendment." 250 F.3d at 683 (internal quotation marks and citation omitted).

Here, under *Baker* and *Lee*, no reasonable prosecutor would have thought it reasonable to continue detaining Mr. Parker after discovering Womack's confession. Indeed, even without Womack's confession, the first assigned prosecutor almost immediately recognized Mr. Parker's innocence and repeatedly complained there was no probable cause to hold him. Rather than release Mr. Parker, individual Defendants chose to replace the prosecutor. But the new assigned prosecutor raised the same concerns before uncovering even more exculpatory evidence, including Womack's jail calls. Even then, individual Defendants continued to detain Mr. Parker, *knowing* he was entitled to release. This is squarely a due process violation under *Baker* and *Lee*.

Defendants try to distinguish *Lee* and *Baker* on the ground that the prolonged detentions in those cases were caused by mistake and misidentification, whereas this case involves the intentional withholding of exculpatory evidence. AAB26-27. But the right asserted here is the right not to be wrongly subjected to prolonged detention. The

29

*cause* of the violation of that right (misidentification or withholding exculpatory evidence) does not define the right. Because the right was known and clearly established, the manner of violating the right is not the relevant issue.

In arguing to the contrary, Defendants wrongly assume that a right is only "clearly established" when it has been recognized in a prior case involving identical circumstances. That, however, is not the law. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (rejecting the notion that officer liability cannot exist "unless the very action in question has previously been held unlawful"); *Deorle v. Rutherford,* 272 F.3d 1272, 1285-86 (9th Cir. 2001) (holding that "when the defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.") (cleaned up; citations omitted).

Because the individual Defendants' conduct in this case was even more "patently violative" of Mr. Parker's rights than the conduct at

issue in *Lee* and *Baker*, the absence of "closely analogous pre-existing case law" is immaterial. *Deorle,* 272 F.3d at 1285-86.

## IV.  The individual defendants are not entitled to absolute immunity.

As Plaintiff has explained, Defendants are not entitled to absolute immunity because their decision to withhold material, exculpatory evidence was administrative rather than prosecutorial in nature. *See* AOB51-60.

In response, Defendants first assert that this argument should not be considered by this Court because it was not argued below. AAB14-15. They then argue that a prosecutor's decision to withhold exculpatory evidence is always covered by absolute immunity. AAB16-22.

Neither argument is persuasive.

First, Mr. Parker sufficiently preserved his argument that the individual Defendants are not entitled to absolute immunity for their actions that fell outside traditional prosecutorial functions. His First Amended Complaint expressly states that because the individual Defendants' actions were "part of the investigatory process" and "not within the ambit of the traditional functions of an advocate," the individual Defendants are not entitled to absolute immunity. 2-ER-41-

31

42. The administrative policy of seeking convictions at any cost, including by withholding exculpatory evidence, fits this description to a tee.

This policy is also squarely covered by the Ninth Circuit's guidance that "[a] prosecutor is granted only qualified immunity." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003); *see also id.* at 1031 ("[E]ven after the initiation of criminal proceedings, a prosecutor may receive only qualified immunity when acting in a capacity that is exclusively *investigatory or administrative*.") (emphasis added).

Plaintiff also argued below that absolute prosecutorial immunity "does not blanket all 'the actions of a prosecutor...merely because they are performed by a prosecutor,'" but rather, "applies selectively depending on the 'functional nature of the activities rather than [the prosecutor's] status.'" SER-34 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), and *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); other citations omitted). Although that section of Plaintiff's brief did not focus on the administrative nature of the policy of securing convictions at any cost, the immediately preceding section ends by noting that the individual "Defendants were acting on behalf of the county" when they

implemented "administrative policies and oversight of deputy district
attorneys that frustrate employees' ability to comply with their
constitutional obligation to disclose compelling exculpatory evidence."
SER33-34.

Thus, the district court pleadings *as a whole* alleged a district-
wide administrative policy implemented by the individual Defendants,
giving rise to Mr. Parker's due process claims against both the County
and the individual Defendants. Defendants' waiver argument should
therefore be rejected.

Second, Defendants' argument that prosecutors are always
entitled to absolute immunity for withholding exculpatory evidence also
fails. Defendants rely on *Garmon v. County of Los Angeles*, 828 F.3d 837
(9th Cir. 2016), to assert that prosecutorial immunity for deliberately
withholding exculpatory information "extends to attorneys supervising
trial prosecutors." AAB16. Their reliance is misplaced.

*Garmon* held that "[a]n attorney supervising a trial prosecutor
who is absolutely immune is also absolutely immune." 828 F.3d at 845.
However, *Garmon* also held that it would *not* "grant a supervising
prosecutor absolute immunity for supervising an activity that's *not*

33

protected by *Imbler* and its progeny." *Id.* (citation and quotations omitted). In other words, supervising attorneys are not entitled to absolute immunity for actions that are not "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430.

As previously explained (AOB56), individual Defendants' actions here were administrative functions, and thus not "intimately associated with the judicial phase of the criminal process." *Id.* In other words, Defendants' actions were not case-specific strategic functions; rather, the decisions that they made with respect to Mr. Parker were pursuant to an office-wide administrative policy of pursuing convictions at all costs, including by withholding exculpatory evidence. *Id.* That means they are not protected by *Imbler* and its progeny, or by *Garmon*.

The individual Defendants are therefore not entitled to absolute immunity.

## V. At a minimum, Mr. Parker should be granted leave to amend to clarify his *Monell* claim.

Even if the Court disagrees with the foregoing, it should reverse the district court's dismissal of this case with prejudice and instruct the district court to afford Plaintiff leave to amend.

34

As this Court has held, "leave to amend shall be freely given when justice so requires." *Gregg v. Dep't of Pub. Safety*, 870 F.3d 883, 889 (9th Cir. 2017) (citing Fed. R. Civ. P. 15(a)); *see also Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010).

Here, justice required granting leave to amend given Plaintiff's "lengthy, and unjustified, detention," which even the district court recognized as "repugnant." 1-ER-9.

As Plaintiff has explained (AOB24), he asked the district court to allow leave to amend if it deemed the complaint insufficient.

In support of this request, Plaintiff explained that he had "propounded a request for production to Defendants requesting records reflecting the imposition of discipline by the Riverside County District Attorney's Office on any employee for failure to sufficiently or timely disclose exculpatory evidence" and that "Defendants did not produce any responsive documents and did not list any responsive document on any privilege log." AOB24 (citing ECF No. 85 at 16). Based on that, Mr. Parker requested leave to file an amended complaint alleging a *Monell* claim for failure to train, supervise, and discipline in the event the court found his complaint insufficient.

The district court denied leave to amend as "futile" on the ground that "any additional allegations that Defendant Zellerbach failed to establish policies and training on the disclosure of exculpatory evidence would still fall under the ambit of prosecutorial functions." 1-ER-11–12. That's incorrect because, as explained above, *Goldstein* itself shows that the fact that a policy has an impact on prosecutorial strategy does *not* rule out imposition of liability under *Monell*.

Defendants seek to avoid such an amendment by arguing that an allegation of failure to train would be inconsistent with Plaintiff's allegation of an office culture of suppressing exculpatory evidence and pursuing convictions at all costs. AAB52-53. But the two scenarios actually go hand in hand. No office with a culture like the one alleged here would prioritize training that would ***undermine*** that culture. Conversely, no office that prioritized training to ensure that prosecutors meet their constitutional obligations would tolerate the type of culture that led to Mr. Parker's unlawful detention.

In short, Plaintiff should, at a minimum, be granted leave to amend to allege a failure to train, supervise, and discipline prosecutors

who fail to disclose exculpatory evidence. *See Puckett v. Cnty. of Sacramento*, No. 2:22-CV-00350-KJM-DB, 2023 WL 2432919, at *9 (E.D. Cal., Mar. 9, 2023) (noting that failure to discipline officers for violating detainees' constitutional rights can support *Monell* claim).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing Mr. Parker's case with prejudice and remand for further proceedings.

July 7, 2025                    Respectfully submitted,

*s/ Leslie A. Brueckner*
Leslie A. Brueckner
SINGLETON SCHREIBER, LLP

**CERTIFICATE OF SERVICE**

I, Leslie A. Brueckner, hereby certify that I electronically filed the foregoing Reply Brief on Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 7, 2025, and it was thereby served on all counsel of record.

*s/ Leslie A. Brueckner*
Leslie A. Brueckner

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5602

I am the attorney or self-represented party.

**This brief contains** | 6,620 | **words,** including [               ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[ ] it is a joint brief submitted by separately represented parties.
　　[ ] a party or parties are filing a single brief in response to multiple briefs.
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [               ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Leslie A. Brueckner | **Date** | 7/7/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*